UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION



United States Courts
Southern District of Texas
FILED

MAR 1 2 2003

Michael N. Milby, Clerk

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | § § § § |
| Plaintiff, | § § § |
| v. | § § |
| KEVIN A. HOWARD, MICHAEL W. KRAUTZ, | § § § |
| | § § |
| Defendants. | § § |

**H-03-0905**

Civil Action No.

**COMPLAINT**

**JURY DEMANDED**

Plaintiff Securities and Exchange Commission (the "Commission") for its Complaint alleges as follows:

## SUMMARY

1.      Defendants Kevin A. Howard and Michael W. Krautz, executives of Enron Broadband Services, Inc. ("EBS"), engaged in a scheme that allowed Enron to recognize and publicly report $111 million in fraudulent earnings. The scheme, known as "Project Braveheart," involved the "monetization" of certain assets resulting in the immediate recognition of earnings from a long term agreement with Blockbuster to develop and provide video-on-demand services. Defendants carried out the scheme by forming a purported joint venture, assigning the Blockbuster agreement to the joint venture, and selling an interest in the joint venture based on the value of future revenues from the Blockbuster agreement to a third party. As a result, EBS recognized $53 million in earnings in the fourth quarter 2000 and $58 million in earnings in the

first quarter 2001, thus enabling EBS to meet its earnings targets.

2.      Project Braveheart was a sham from its inception. The transaction had no economic substance and was created solely for the purpose of generating earnings. The joint venture partner was an entity that never intended to participate as a partner, and its equity was not at risk because Enron guaranteed the entity a short term take-out at a specified rate of return.

3.      As a result of defendants' unlawful conduct, Enron filed periodic public reports, and accompanying public statements, that were materially false and misleading. Defendants violated the antifraud provisions of the federal securities laws, and the Commission seeks disgorgement of their unlawful gains, civil penalties, permanent injunctions, and officer and director bars.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e) and 78aa] and Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a)].

5.      Venue lies in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 22 of the Securities Act [15 U.S.C. § 77v(a)] because certain acts or transactions constituting the violations occurred in this District.

6.      In connection with the acts, practices, and courses of business alleged herein, defendants, directly or indirectly, made use of the means and instruments of transportation and communication in interstate commerce, and of the mails and of the facilities of a national securities exchange.

7.     Defendants, unless restrained and enjoined by this Court, will continue to engage in transactions, acts, practices, and courses of business as set forth in this Complaint or in similar illegal acts and practices.

## DEFENDANTS

8.     Kevin A. Howard resides in Houston, Texas.  Howard was Vice President for Finance of EBS from approximately August 1, 1999 to September 2001.  Howard is still employed at Enron.  Howard was the senior EBS executive who supervised all aspects of the Braveheart transaction.

9.     Michael W. Krautz resides in Houston, Texas.  Krautz was Senior Director of Transactional Accounting at EBS from approximately August 16, 1999 to October 3, 2001.  He is still employed at Enron.  Krautz was the senior EBS accountant who worked on the Braveheart transaction.

## OTHER ENTITIES INVOLVED

10.     Enron Corp. is an Oregon corporation with its principal place of business in Houston, Texas.  During the relevant time period, the common stock of Enron was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange.  In 2000-2001, while defendants engaged in the fraudulent conduct alleged herein, Enron raised millions in the public debt and equity markets.  Among other operations, Enron was the nation's largest natural gas and electric marketer with reported annual revenue of more than $150 billion.  Enron rose to number seven on the *Fortune 500* list of companies.  By December 2, 2001, when it filed for bankruptcy, Enron's stock price had dropped in less than a year from more than $80 per share to less than $1.

11.     Enron Broadband Services, Inc. ("EBS") was a wholly- owned subsidiary of Enron engaged in the telecommunications business.

## FACTUAL ALLEGATIONS

**Origin of the Braveheart Transaction**

12.     In April 1999, Enron announced that it had built a very advanced software-powered telecommunications network capable of delivering video and data products and services unavailable from other competitors.  Enron made this network, called the Enron Intelligent Network, a major focus of the annual conference that it hosted for securities analysts on January 20, 2000.  The presentation was received favorably by analysts and investors, and that day the share price of Enron stock soared from $54 to $67 on the strength of Enron's telecommunications business.  Between the time of the April 1999 announcement and the end of Enron's first financial quarter of 2000, however, EBS had failed to generate any significant recurring revenues from its telecommunications business, and instead lost large amounts of money.

13.     On April 5, 2000, EBS signed an agreement with Blockbuster Inc. ("Blockbuster"), the nation's largest retailer of videos for home viewing, to stream video films to customers' homes.  Under the agreement, Blockbuster was responsible for obtaining digital rights to film content from film studios and other sources.  EBS was responsible for encoding the movies Blockbuster obtained, streaming them over a telecommunications network to customers' homes, and then billing the customers for the service.  This business was known as "video on demand,"or "VOD," because the customers were supposed to be able to access and watch movies in their homes whenever they wanted.  EBS's plan was to begin a test of the VOD service by

-4-

approximately December 15, 2000.

14.     At the time the parties entered into the agreement, EBS did not have the technology to provide VOD over its network. In addition, Blockbuster did not have the rights to distribute first-run movies digitally over the Internet. Blockbuster warned EBS that it could take years to obtain digital rights to first-run movies, as studios were concerned about pirating and obtaining a share of the revenues from VOD.

15.     By late summer of 2000, EBS anticipated an earnings shortfall for 2000 and sought to recognize income from the Blockbuster agreement. In late summer of 2000, Howard asked an EBS finance expert to examine the Blockbuster transaction in order to see if there was any way Enron could derive accelerated earnings from the deal in the fourth quarter of 2000. Howard's goal was to monetize the Blockbuster deal by entering into a structured finance transaction.

16.     EBS planned to carry out the monetization by (a) estimating the amount of future revenue that EBS likely would earn over the life of the Blockbuster contract; (b) creating a structured finance entity, in this case a joint venture, and assigning the contract to the joint venture; (c) selling to a third party a portion of its joint venture interest for cash equal to the present value of a portion of the cash expected to be received in the course of the contract; and (d) recording those revenues as if they had been earned not over the life of the contract but at the time of the monetization. All of these aspects of the transaction were to occur simultaneously.

17.     During the remainder of 2000, Howard, Krautz, and others worked to accomplish this goal. This structured finance transaction was known at EBS by a code name, "Braveheart." Howard made all of the strategic decisions regarding the transaction and was aware of all

-5-

material details. Krautz was aware of all material facts related to the deal.

**Structure of the Braveheart Transaction**

18.     In the Braveheart transaction, Enron formed a joint venture, known as EBS

Content Systems LLC ("Content Systems LLC") with two investors: nCube, a VOD technology

company based in Portland, Oregon, and "Thunderbird," an investment vehicle which was owned

by an Enron-controlled investment trust. On the same day that it formed the joint venture, EBS

assigned the Blockbuster contract to Content Systems LLC and sold a portion of its interest in the

joint venture to an investment structure called Hawaii 125-O, which was created and funded by

the Canadian Imperial Bank of Commerce ("CIBC"). Enron recognized the $111 million gain it

received from this transaction as earnings in the fourth quarter of 2000 and the first quarter of

2001. These earnings were recorded on Enron's 2000 10-K and first quarter 2001 10-Q filings

with the Securities and Exchange Commission.

**Summary of the Fraud**

19.     The Braveheart transaction and the earnings it generated were fraudulent: nCube

was a joint venture partner in name only; nCube's investment was not at risk; and CIBC's equity

stake in the Hawaii 125-O structure had been guaranteed against loss by Enron. Howard, Krautz

and others intentionally created a structure that had no economic substance for the sole purpose

of recording $111 million in fictitious earnings for Enron. Enron would not have been able to

report the $111 million derived from the transaction as earnings but for the fraud. This amount

was material to Enron's reported financial results.

**nCube Was A Joint Venture Partner In Name Only**

20.     The joint venture was a sham because nCube was not expected to participate as a

-6-

partner in the venture. Howard and the Braveheart transaction team decided not to propose forming a joint venture with Blockbuster because EBS feared losing control over the VOD business. Instead, under Howard's direction, the team elected to form the joint venture with nCube, a small VOD technology company that was one of EBS's vendors. Howard thought this was a good idea because Howard believed nCube would do whatever Enron wanted in the joint venture. In discussions within EBS, Howard stated that nCube would let Enron run the join venture, and Krautz stated that he liked the fact that nCube would not try to dictate strategy.

21.     When Howard presented the transaction to nCube, Howard stated that EBS would control the joint venture. According to an nCube executive who participated in a telephone call with Krautz and others to discuss the transaction, an EBS employee stated during the call that EBS would control management of the joint venture, but the transaction documents could not state this, as it would ruin the accounting treatment.

22.     After the joint venture was formed, Enron continued to treat nCube like a vendor and not like a true joint venture partner. This fact is evidenced by, among other things, Enron's practice of making all strategic decisions about the joint venture without input from nCube. EBS did not want or seek nCube's participation in the management of the joint venture. According to a senior executive responsible for Enron's VOD business, the joint venture formed with nCube was never a real business, but simply a "box on a piece of paper" designed to allow Enron to report earnings.

23.     The planned transaction called for EBS to assign the Blockbuster contract to Content Systems LLC in order to give Content Systems LLC a future revenue stream which it, in turn, could recognize as income. However, under the terms of the Blockbuster contract, EBS

-7-

was not allowed to assign the contract to a third party not under Enron's control without approval

from Blockbuster. EBS initially tried to obtain Blockbuster's consent to a third-party

assignment, but Blockbuster refused to consent. After these negotiations failed, EBS lawyers

determined that Enron could legally assign the contract to Content Systems LLC without consent

from Blockbuster. EBS lawyers reached this conclusion because Krautz had told them that

Enron would control Content Systems LLC.

**nCube's Investment Was Not At Risk**

24.     Howard and Krautz knew that nCube's equity investment was not at risk. To

induce nCube to participate in the joint venture, Howard promised nCube in the fall of 2000 that

nCube would be "taken out of" the deal early in 2001. At that time, nCube would receive its

investment back plus a fixed return in the range of $100,000 to $200,000. Krautz was aware of

this arrangement. The guarantee made to nCube clearly violated the requirement that nCube's

equity investment be at risk. This guarantee was intentionally not memorialized or disclosed in

the legal documents creating the joint venture.

25.     nCube never felt that its investment was at risk because it expected Enron to keep

Howard's take-out commitment. Krautz and Howard promised nCube that no matter what

happened to the joint venture, nCube would get its money back plus a fixed return in early 2001.

Krautz stated to nCube that this guarantee could not be written into the joint venture agreement

because it would "blow the accounting treatment."

26.     A large number of documents from Enron and nCube confirm the terms of the

transaction. These documents include: (a) an October 2000 draft joint venture proposal, which

was sent to Howard via e-mail for review and which promised nCube a guaranteed set return on

-8-

its investment; (b) a November 2000 final joint venture proposal, which was e-mailed to Howard for review, promising nCube a one-to-three month exit with a pre-determined profit; (c) a November 22, 2000 "accounting entries proposal," which was e-mailed to both Howard and Krautz by an EBS accountant, showing nCube exiting the transaction in February 2001 with a $100,000 profit; and (d) a May 2001 memorandum, which was written for and sent to Howard by e-mail, stating that an understanding existed that nCube would be taken out of the deal in 2001 for a fixed profit of $200,000.

**CIBC's Investment**

27.     After Enron formed the joint venture with nCube and Thunderbird, it sold a portion of its interest in the joint venture to the Hawaii 125-O investment trust for $111 million, $53 million in the fourth quarter of 2000, and $58 million in the first quarter of 2001. The $111 million received by Enron from Hawaii 125-O could be purportedly reported as earnings rather than debt because the Hawaii 125-O trust was capitalized, in part, with a 3% at-risk equity stake from CIBC. CIBC's 3% equity, however, was not at risk.

28.     The CIBC investment in Hawaii 125-O was not at risk because Enron gave CIBC an oral guarantee that CIBC would not lose money on any of its large number of Hawaii 125-O transactions with Enron. On June 21, 2001, a CIBC banker sent an e-mail to colleagues asking about the bank's risk exposure from the Hawaii 125-O transactions. Two CIBC bankers responded to the query. One banker stated that Enron's Chief Financial Officer, Andrew Fastow, had "given his strongest possible assurance that the risk won't be realized." The e-mail noted that when the value of one particular asset sold to Hawaii 125-O became impaired, Enron returned the money from the transaction to CIBC. The second banker replied: "Unfortunately,

there can be no <u>documented</u> means of guaranteeing the equity or any shortfall or the sale accounting treatment is affected. We have a general understanding with Enron that any equity loss is a very bad thing. They have been told that if we sustain any equity losses, we will no longer do these types of transactions with them. Not many other institutions are willing to take such risks, so it is important to Enron to keep us happy... We have done many 'trust me' equity transactions over the last 3 years and have sustained no losses to date. If there has been a case where the value of the asset has been in question, Enron has repurchased the asset at par plus our accrued yield." (Emphasis in original).

29. Howard was aware that the CIBC equity was not at risk. Howard presented an executive overview of the Braveheart transaction to EBS's Chief Operating Officer and Chief Executive Officer in April 2001. One portion of Howard's presentation was entitled "CIBC Exit Strategy." It stated that by the end of 2001, Enron would have to replace CIBC with " 'true' outside equity, (i.e. without ENE support)."

**Blockbuster Termination Risk**

30. The Blockbuster contract specified that if EBS failed to sign distribution agreements with four regional Bell operating companies by December 2000, Blockbuster had the right to terminate the agreement. EBS failed to meet this requirement. EBS senior executives, including Howard, the Chief Executive Officer, the Chief Operating Officer and others, discussed the serious risk that Blockbuster would terminate the contract on a daily basis in late 2000. The fact that EBS was in breach of the Blockbuster contract and faced possible termination was not disclosed to nCube, CIBC, Enron's auditors Arthur Andersen, or the investing public until March 9, 2001, when Enron and Blockbuster publicly terminated the

-10-

contract.

31.     In order to prevent termination of the contract, EBS negotiated an extension with Blockbuster in December 2000, in which both parties agreed not to terminate the contract before March 2001.  One major purpose of extending the agreement was to protect the Braveheart monetization, which would fall through if the contract were cancelled.  On December 21, 2000, one day before the Braveheart transaction closed, a lawyer involved in the extension negotiations, wrote a memo to the file.  In the memo, the lawyer noted that EBS had assumed major potential cost liability in order to get the extension, and in his view EBS would be forced into a "termination scenario" anyway within two months.  The lawyer was told by senior executives that the extension was necessary to conclude the Braveheart transaction.  The Blockbuster contract eventually terminated on March 9, 2001, before the conclusion of the extension period.

**Howard and Krautz Deceived Arthur Andersen**

32.     Howard and Krautz intentionally misled Andersen about the true character of the Braveheart transaction because they believed that Andersen would not approve of the transaction or allow EBS to record any revenues had Andersen known the truth.  Howard and Kurtz did not inform Andersen of facts revealing the true nature of the transaction, and in meetings and conversations with Andersen made false and misleading statements about the transaction.

33.     Neither Howard and Krautz, nor anyone else at EBS ever told Andersen that EBS intended to control the joint venture, that nCube was expected to exit the venture early in 2001, that nCube was promised a fixed return for their investment, that the CIBC equity stake was not at risk, that documents had been back-dated, or that there was a significant possibility in late 2000 that Blockbuster and Enron would terminate their relationship.

-11-

**EBS Treated The Fraud As A Joke**

34.     In December 2000, the Braveheart team presented a skit and accompanying powerpoint presentation at an EBS Christmas party. Before the presentation, the powerpoint was sent to Howard by e-mail.

35.     The Christmas powerpoint presentation joked about numerous fraudulent aspects of the Braveheart transaction and the underlying VOD business. For example, the presentation noted that EBS had been unable to obtain the assignment consent from Blockbuster needed to complete the transaction; that the set top boxes used to deliver movies to the customer had caught on fire during tests; and that the joint venture was only going to last one quarter after which it would have to be unwound. One portion, called "The Grinch that Stole VOD," pictured the Arthur Andersen auditors as Dr. Seuss's "The Grinch," trying to stop the transaction. This section included a piece of Seuss-like rhyme: "One Deal, Two Deal, Red Deal, No Deal. You cannot do it without GAAP. You can't do it because it's crap. You cannot do it for 25. What the hell, let's go for 65." Another portion likened Arthur Andersen to an iceberg that was going to sink the VOD ship.

36.     After the party EBS's general counsel directed that all copies of the Christmas powerpoint be destroyed. The order was given because the powerpoint contained incriminating material.

**The Fraudulent Earnings Were Material**

37.     The size of the Braveheart transaction grew rapidly over the course of the fourth quarter of 2000. Enron reported approximately $53 million in earnings from Braveheart in the fourth quarter of 2000 and $58 million in the first quarter of 2001. These amounts were material

to the financial results of Enron. These earnings were reported on Enron's fourth quarter 2000

10-K filing and in Enron's first quarter 2001 10-Q filing with the SEC.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

38.     Paragraphs 1 through 37 are realleged and incorporated by reference herein.

39.     As set forth fully above, defendants, directly or indirectly, by use of the means or

instrumentalities of interstate commerce, or by the use of the mails and of the facilities of a

national securities exchange, in connection with the purchase or sale of securities: have employed

devices, schemes, or artifices to defraud, have made untrue statements of material facts or

omitted to state material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading, or have engaged in acts, practices,

or courses of business which operate or would operate as a fraud or deceit upon any person.

40.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

41.     Paragraphs 1 through 40 are realleged and incorporated by reference herein.

42.     Defendants, by engaging in the conduct described above, directly or indirectly, in

connection with the offer or sale of securities, by the use of the means or instruments of

transportation or communication in interstate commerce or by the use of the mails: with scienter,

employed devices, schemes, or artifices to defraud, obtained money or property by means of

untrue statements of material facts or omissions to state material facts necessary in order to make

the statements made, in the light of the circumstances under which they were made, not

misleading, or engaged in acts, practices, or courses of business which operate or would operate

as a fraud or deceit upon the purchasers of such securities.

43.     By reason of the foregoing, defendants violated Section 17(a) of the Securities

Act.

## THIRD CLAIM

### Aiding & Abetting Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, & 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13]

44.     Paragraphs 1 through 43 are realleged and incorporated by reference herein.

45.     By engaging in the conduct described above, defendants knowingly and

substantially caused Enron to file with the Commission a false and misleading report on Enron's

2000 Form 10-K, and a false and misleading first quarter 2001 Form 10-Q.

46.     By reason of the foregoing, defendants aided and abetted violations by Enron of

Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

## FOURTH CLAIM

### Aiding & Abetting Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1]

47.     Paragraphs 1 through 46 are realleged and incorporated by reference herein.

48.     By engaging in the conduct described above, defendants aided and abetted

Enron's failures to make and keep books, records and accounts which, in reasonable detail,

-14-

accurately and fairly reflected Enron's transactions and dispositions of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act, and further aided and abetted failures to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Enron's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with generally accepted accounting principles in violation of Section 13(b)(2)(B) of the Exchange Act.

49.     By engaging in the conduct described above, defendants, directly or indirectly, falsified and caused to be falsified Enron's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act in violation of Rule 13b2-1 thereunder.

50.     By reason of the foregoing, defendants aided and abetted violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and violated Rule 13b2-1 thereunder.

## FIFTH CLAIM

### Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]

51.     Paragraphs 1 through 50 are realleged and incorporated by reference herein.

52.     By engaging in the conduct described above, defendants knowingly circumvented or knowingly failed to implement a system of internal financial controls at Enron.

53.     By reason of the foregoing, defendants violated Section 13(b)(5) of the Exchange Act.

## JURY DEMAND

54.     The Commission demands a jury in this matter.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.      Grant a Permanent Injunction restraining and enjoining defendants from violating

the statutory provisions set forth herein; prohibiting them permanently and unconditionally from

acting as officers or directors of any public company; and ordering them to pay disgorgement of

illegal gains, and civil penalties;

B.      Pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204

(2002), enter an order providing that the amount of civil penalties be added to and become part of

a disgorgement fund for the benefit of the victims of the violations alleged herein; and

C.      Grant such other and additional relief as this Court may deem just and proper.

Dated: March  11 , 2003                      Respectfully submitted,


                                             Stephen M. Cutler
                                                 Director, Enforcement Division
                                             Linda Chatman Thomsen
                                                 Deputy Director, Enforcement Division
                                             Charles J. Clark
                                                 Assistant Director, Enforcement Division


                                             Luis R. Mejia
                                             Assistant Chief Litigation Counsel
                                             Attorney-in-Charge, Plaintiff
                                             Securities and Exchange Commission
                                             450 Fifth Street, N.W.
                                             Washington, DC 20549-0911
                                             Phone: (202) 942-4744 (Mejia)
                                             Fax:    (202) 942-9569 (Mejia)


Of Counsel:
Deborah A. Tarasevich

-16-